UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

| | |
|---|---|
| JOSE QUINTERO ) | |
| ) | |
| Petitioner ) | Civil Action No. 5: 07-CV-432-JBC |
| ) | |
| v. ) | |
| ) | |
| STEPHEN DEWALT ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Respondent ) | |

\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\*

Jose Quintero ("Quintero"), an inmate incarcerated at the Federal Medical Center in Lexington, Kentucky ("FMC-Lexington"), has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 [R. 2] and paid the $5 filing fee. [R. 5, 7] Fully briefed, this matter stands ready for decision.

As Quintero is appearing *pro se*, his petition is held to less stringent standards than those drafted by attorneys. *Burton v. Jones*, 321 F.3d 569, 573 (6th Cir. 2003); *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999). At this juncture, the allegations in his petition are taken as true and liberally construed in his favor. *Urbina v. Thoms*, 270 F.3d 292, 295 (6th Cir. 2001). But the Court may dismiss the petition at any time, or make any such disposition as law and justice require, if it determines that the petition fails to establish adequate grounds for relief. *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987).

I.   **BACKGROUND**

On April 19, 1988, Quintero was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) and was sentenced to a 40-year term of incarceration. *United States v. Quintero*, 87-CR-336, Western District of Texas.

Following his conviction, Quintero began serving his sentence at the Federal

Correctional Institution in Bastrop, Texas ("Bastrop"). On February 1, 1989, Quintero's work supervisor recommended that he begin to receive Meritorious Good Time ("MGT") credits in light of his favorable work performance.[1] When that recommendation was approved, Quintero began to receive MGT at a rate of 3 days per month for the first 12 months of earning status. Thereafter, beginning on February 1, 1990, Quintero began to receive MGT at a rate of 5 days per month.

The Bureau of Prisons ("BOP")'s Sentence Monitoring Sheet ("SMS") indicates that Quintero continued to earn MGT until December 27, 1990, the date on which it appears he was transferred to the United States Penitentiary in Leavenworth, Kansas ("Leavenworth"). Quintero did not earn any species of extra good time until he began working for United Prison Industries ("UNICOR") on June 19, 1991. From that date until March 23, 1993, Quintero earned Industrial Good Time ("IGT") because of his employment with UNICOR.

At this time, Quintero was transferred to the Federal Correctional Institution in Three Rivers, Texas ("Three Rivers"). Shortly after his arrival at Three Rivers, the BOP's SMS indicates that on May 25, 1993, he began receiving MGT. Quintero contends that during this period he was earning MGT at a rate of only 3 days per month. From April 19, 1993, to April 29, 1993, Quintero earned IGT. Finally, Quintero continued to earn MGT at Three Rivers until his transfer on September 20, 1994.

On that date, Quintero was transferred to the United States Penitentiary in Atlanta, Georgia ("Atlanta"). Quintero was removed from earning status until his return to work for UNICOR on October 4, 1994, at which point he resumed earning IGT. On January 27, 1995,

---

[1] Quintero is an "old law" inmate because his offense conduct was completed before November 1, 1987. Accordingly, his ability to earn extra good time credits is governed by 18 U.S.C. § 4162. The BOP implements the statutory requirements of Section 4162 through administrative regulations promulgated at 28 C.F.R. § 543.1 *et seq.* and as further described in BOP Program Statement 5880.30, Chapter XIII.

when he was transferred to work as an orderly, he stopped receiving IGT.

Quintero was subsequently transferred back to Three Rivers and was not returned to earning status until July 1, 1997. While at Three Rivers, Quintero contends, he earned EGT at a rate of 3 days per month for the first year and thereafter at a rate of 5 days per month until May 23, 2000.

At this time Quintero was transferred to the United States Penitentiary in Beaumont, Texas ("Beaumont"). His earning status was terminated upon his transfer and did not resume until he began working for UNICOR on January 22, 2002. Quintero earned IGT until March 28, 2002, when he surrendered his job with UNICOR because the cloth dust was aggravating his emphysema.

The BOP's SMS indicates that Quintero was awarded a total of 810 days of earned good time, of which 85 days were lump-sum awards by wardens. The SMS also indicates that disciplinary proceedings against Quintero resulted in the loss or forfeiture of 1030 days of earned good time. [R. 13-5, Att. 4 to Affidavit of John A. Farrar, employed by BOP's Designation and Sentence Computation Center in Grand Prairie, Texas]

In his petition and reply, Quintero argues that the BOP's calculation of the total amount of EGT he has earned is incorrect. Quintero's primary contention is based upon an interpretation of the BOP's regulations, under which he contends that he continued to earn EGT notwithstanding his transfers to new institutions because the warden never expressly terminated his earning status. Quintero also contends that the BOP's policy of automatically terminating the EGT earning status of an inmate upon his transfer to a USP or FCI violates Equal Protection principles because it is not applied to inmates in camps, farms, or community corrections centers. Finally, Quintero contends that the BOP is not giving him the benefit of the seniority status he has earned under applicable BOP regulations. The Court will address these issues in turn.

**II.   DISCUSSION**

The relevant statute, 18 U.S.C. § 4162, provides:

A prisoner may, in the discretion of the Attorney General, be allowed a deduction from his sentence of not to exceed three days for each month of actual employment in an industry or camp for the first year or any part thereof, and not to exceed five days for each month of any succeeding year or part thereof.

In the discretion of the Attorney General such allowance may also be made to a prisoner performing exceptionally meritorious service or performing duties of outstanding importance in connection with institutional operations.

Section 4162 was repealed on November 1, 1987, but continues to apply to "old law" prisoners like Quintero. *Moss v. Clark*, 698 F.Supp. 640, 644 (E.D.Va. 1988), *rev'd on other grounds*, 886 F.2d 686 (4th Cir. 1989).

The discretion granted to the Attorney General pursuant to Section 4162 to award EGT has been delegated to the BOP pursuant to 28 C.F.R. 0.96(h). Program Statement 5800.30, Chapter XIII, § 1(b). The BOP has promulgated administrative regulations to govern the application of Section 4162. Those regulations explain that "old law" prisoners may earn various forms of "Extra Good Time," including Meritorious Good Time for good conduct of particular note; Work/Study Release Good Time and Community Corrections Center Good Time for participation in such programs; Industrial Good Time for certain forms of approved work while in prison; Camp or Farm Good Time earned while in low security facilities; and Lump Sum Awards given at the discretion of the warden. 28 C.F.R. § 523.1(b). However, an inmate may earn only one type of extra good time award at a time. 28 C.F.R. § 523.10(a).

   **A.   Section 523.17(e) governs Quintero's earning status following a transfer.**

Quintero first contends that the BOP erred when it removed him from earning status following each of his transfers to a new penal institution. In doing so, the BOP acted pursuant to 28 C.F.R. § 523.17(e), which provides:

An inmate who is transferred remains in the earning status at time of transfer,

> unless the reason for transfer would otherwise have caused removal from an earning status, and provided the inmate's behavior is such while in transit that it does not justify removal. Where the receiving institution is a camp, farm, or community corrections center, the extra good time continues automatically upon the inmate's arrival. ***Where the receiving institution is other than a camp, farm, or community corrections center, the extra good time is terminated upon arrival***, and staff at the receiving institution shall review each case to determine if the inmate should continue in meritorious good time earning status if not immediately employed in Federal Prison Industries or assigned to a work/study release program.

(emphasis added). Because Quintero has remained in medium-security FCIs and high-security USPs throughout his incarceration, upon each transfer the BOP terminated his earning status pursuant to this section until staff at the receiving institution affirmatively restored him to earning status.

Quintero does not contend that this provision is inapplicable, but he asserts that it is inconsistent with another BOP regulation which governs procedures used in awarding or terminating EGT:

> The Warden or the Disciplinary Hearing Officer may not forfeit or withhold extra good time. The Warden may disallow or terminate the awarding of any type of extra good time (except lump sum awards), but only in a nondisciplinary context and only upon recommendation of staff.

28 C.F.R. § 523.10(a). Quintero argues that this provision requires the warden to affirmatively act to terminate EGT earning status in all instances. Because no warden ever affirmatively acted to terminate his earning status pursuant to Section 523.17(g), he contends that he is entitled to be awarded EGT continuously from the date he was placed on EGT earning status until such time that his earning status is expressly terminated or he is released. Quintero alternatively contends that the two provisions are inconsistent, causing an ambiguity in their interpretation which should be resolved in his favor under the "rule of lenity."

The BOP's response to the petition is devoid of any response to Quintero's argument. Rather, the BOP contends, premised on the ***assumption*** that Section 523.17(e) permitted it

to terminate Quintero's earning status upon his transfer to a USP or FCI, that its resulting computation of his EGT is correct. The Court cannot, however, accept Quintero's invitation to rule in his favor simply because the BOP has not argued against his position.

The Court concludes that, contrary to Quintero's argument, Section 523.10(a) does not require the warden to affirmatively act to terminate EGT earning status in all instances, but rather only in those circumstances not governed by another, more specific provision. This issue was squarely presented to the Third Circuit in the only decision to discuss Section 523.17, *Mansfield v. Beeler*, 2007 WL 1732566 (3rd Cir. 2007). In that case, an inmate convicted of military crimes but serving his sentence in federal custody sought IGT for 4 years he spent in a hospital after he had been placed in IGT earning status. In support of his position the inmate relied upon 28 C.F.R. § 523.17(g):

> Extra good time is not automatically discontinued while an inmate is hospitalized, on furlough, out of the institution on a writ of habeas corpus, or removed under the Interstate Agreement on Detainers. Extra good time may be terminated or disallowed during such absences if the Warden or the Discipline Hearing Officer finds that the inmate's behavior warrants such action.

The inmate argued that "because no action was taken to terminate his status as earning Industrial Good Time Credit, he continued to earn the credit for the four years that he was hospitalized in Missouri and North Carolina." *Id*. at **3.

The Third Circuit flatly rejected this argument:

> Mansfield errs in assuming that his earning status would have been governed by § 523.17(g). Rather, when he was transferred from Lewisburg, his earning status would have been governed by § 523.17(e), which governs the earning status of inmates transferred between institutions. Where, like in Mansfield's case, an inmate is transferred to another prison or a medical center, "the extra good time is terminated upon arrival."

*Mansfield*, 2007 WL 1732566 at **4. Although the Third Circuit did not elaborate on the basis for its ruling, it is clearly premised upon the notion that it is unnecessary for the warden to affirmatively act to terminate earning status under Section 523.17(g) under circumstances

where that earning status has already been automatically terminated by virtue of a transfer under Section 523.17(e). This view is consistent with an understanding that the two sections exists to address different situations. Where an inmate is transferred to another institution, Section 523.17(e) controls, and his earning status is automatically terminated, and is restored once the inmate satisfies a condition for earning status and prison staff take affirmative action to restore his status. In contrast, where an inmate's situation *within* a particular institution changes and prison staff determine that earning status is no longer warranted, the general provision of Section 523.10(a) (or other specific provisions like Section 523.17(g)) controls, and the warden must adopt the staff's recommendation before the inmate's earning status is altered. So viewed, the sections act as complements in a coherent regulatory framework rather than as inconsistent, competing rules applicable to a single situation. In the present case, Quintero was transferred between institutions on numerous occasions, each transfer resulting in an automatic but temporary suspension of his EGT earning status under Section 523.17(e) pending a staff determination to restore that status. Because that provision is controlling under such circumstances, there simply exists no ambiguity in the application of the relevant regulations which requires resort to the rule of lenity.[2] The BOP was therefore not required to obtain the warden's express direction that Quintero's EGT earning status be suspended upon his transfer, and its calculation of his EGT is therefore not erroneous on that basis.

      **B.**     <u>**Section 523.17(e) does not violate Quintero's equal protection rights**</u>.

---

   [2] Even were an ambiguity present, it would be resolved under the interpretive framework established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), not the rule of lenity. *See Sash v. Zenk*, 439 F.3d 61, 64-65 (2nd Cir. 2006) (any ambiguity in 18 U.S.C. § 3624(b), which relates to good-time credits is therefore a sentencing-administration statute, must be resolved using *Chevron*'s interpretive framework rather than the rule of lenity, which must be used to address ambiguities in criminal punishment statutes); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 704 n.18 (1995) ("We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement.").

Quintero next contends that 28 C.F.R. § 523.17(e) violates the Equal Protection Clause because it treats prisoners who have been transferred to a USP or FCI differently than those transferred to a camp, farm or community corrections center. Section 523.17(e) unquestionably treats these two categories of prisoners differently by automatically terminating the EGT earning status of the former while continuing the earning status of the latter.

However, the Equal Protection Clause does not prohibit the government from treating different groups of persons in different ways; it merely prohibits the government from doing so arbitrarily or for a legally impermissible reason. Prisoners are not members of a protected class for Equal Protection purposes. *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997). Accordingly, the distinction embodied in the regulation is permissible if it is rationally related to a legitimate government interest. *United States v. Kras*, 409 U.S. 434, 436 (1973).

Under this highly deferential standard, Quintero's attack on the BOP's regulation must fail. As a threshold matter, a premise fundamental to any Equal Protection claim is that the two groups of persons being treated differently are "similarly situated." But prisoners in high- and medium-security facilities like USPs and FCIs live in markedly different circumstances than those residing in lower-security facilities like a federal prison camp or community corrections center, and an Equal Protection claim based upon different treatment given to prisoners under such decidedly different environments fails as a matter of law. *Cf. Fogle v. Pierson*, 435 F.3d 1252, 1263 (10th Cir. 2006) ("Fogle's equal protection arguments are ... , in essence, claims that the restrictions placed on inmates in administrative segregation are more burdensome than the restrictions placed on general population inmates. However, as noted above, Fogle was not similarly situated to general population inmates while he was in administrative segregation.").

Even ignoring this fundamental defect, the distinction imposed by Section 523.17(e) is merely procedural and does not affect the substantive criteria used to assess the prisoner's

eligibility for EGT earning status. The section merely directs BOP staff to immediately consider restoring a transferred inmate to EGT earning status if he or she has not already been returned to that status automatically by virtue of working for UNICOR or other approved work/study programs. Given that a prisoner's outright loss of the ability to earn good-time credits while placed in a more restrictive form of custody like segregation does not implicate constitutional concerns, *Twyman v. Crisp*, 584 F.3d 353, 356 (10th Cir. 1978), the mere existence of a temporary burden on the ability to earn such credits cannot establish an Equal Protection claim. *Gwinn v. Awmiller*, 354 F.3d 1211, 1228 (10th Cir. 2004) (conditioning inmate's ability to earn good-time credits upon his completion of sex-offender treatment program does not violate Equal Protection Clause).

  C. **Quintero has accrued EGT at the "Seniority" rate since February 1, 1990.**

Quintero also alleges that at various times the BOP failed to properly award him EGT at a rate of 5 days per month after he obtained "Seniority" under BOP guidelines. The BOP has not responded to this argument other than to reiterate its position that its calculations were proper. To address Quintero's concerns, the Court will engage in a slightly more searching analysis.

The applicable regulation provides:

> Seniority refers to the time accrued in an extra good time earning status. Twelve months of "seniority" automatically cause the earning rate to increase from three days per month to five days per month and seniority is then vested.

28 C.F.R. § 523.1(c). The BOP's SMS indicates that Quintero was continuously in EGT earning status from February 1, 1989 to February 1, 1990. [R. 13-5 at pg. 2] Accordingly, Quintero should have been earning EGT at a rate of 5 days per month once he earned seniority on February 1, 1990.

While the BOP's SMS provides the date ranges during which Quintero was in earning

status, it does not explain the rate at which he was earning EGT for each period. The BOP provides a detailed framework for calculating EGT in Program Statement 5880.30, Chapter XIII, § 12 at pg. 11. That framework embodies two rules:

1. For each full month an inmate is in earning status for the entire month, the inmate earns the full amount of available EGT, either 3 days during the first year of earning status or 5 days thereafter once the inmate has earned Seniority.

2. For each month an inmate is in earning status for only part of a month, the inmate earns a *pro rata* amount of available EGT, with any fractional portion of a day of earned EGT rounded upwards to the next whole number.

Applying that framework to the information in Quintero's SMS yields the following calculations:

| Year | Periods in Earning Status | Rate | Earned EGT | Total |
|---|---|---|---|---|
| 1989 | 11 months | 3 days | 33 | 33 days |
| 1990.a | 1 month [Seniority vests] | 3 days | 3 | 3 days |
| 1990.b | 10 months; $^{27/31}$ days | 5 days | 50+5 | 55 days |
| 1991 | 6 months; $^{12/30}$ days | 5 days | 30+2 | 32 days |
| 1992 | 12 months | 5 days | 60 | 60 days |
| 1993 | 9 months; $^{23/30}$, $^{11/31}$, $^{6/31}$ days | 5 days | 45+4+2+1 | 52 days |
| 1994 | 10 months; $^{20/30}$, $^{27/31}$ days | 5 days | 50+4+5 | 59 days |
| 1995 | $^{27/31}$ days | 5 days | 5 | 5 days |
| 1996 | 0 months | 5 days | 0 | 0 days |
| 1997 | 6 months | 5 days | 30 | 30 days |
| 1998 | 12 months | 5 days | 60 | 60 days |
| 1999 | 12 months | 5 days | 60 | 60 days |
| 2000 | 5 months; $^{23/31}$ days | 5 days | 25+4 | 29 days |
| 2001 | 0 months | 5 days | 0 | 0 days |
| 2002 | 1 month; $^{10/31}$, $^{28/31}$ days | 5 days | 5+2+5 | 12 days |
| 2003 | 0 months | 5 days | 0 | 0 days |
| 2004 | 8 months | 5 days | 40 | 40 days |
| 2005 | 12 months | 5 days | 60 | 60 days |
| 2006 | 12 months | 5 days | 60 | 60 days |
| 2007 | 12 months | 5 days | 60 | 60 days |
| 2008 | 4 months; $^{14/31}$ days | 5 days | 20+2 | 22 days |
| | | | **Total:** | **732 days** |

While the BOP's SMS for Quintero reaches a different total of 725 days, this 7-day difference may be attributable to the report's not yet reflecting EGT earned in March (5 days) or the

partial month of April (2 days) as of the date of its creation.[3]  What is clear is that the totals stated in the BOP's SMS for Quintero are reflective of the 5-day accrual rate for an inmate with seniority, and his concern that the BOP is not giving him proper credit is misplaced.

### III.   CONCLUSION

Accordingly, **IT IS ORDERED** that:

1. Quintero's motion to appoint counsel [R. 18] is **DENIED AS MOOT**.

2. Quintero's petition for a writ of habeas corpus [R. 2] is **DENIED**.

3. Judgment shall be entered contemporaneously with this Memorandum Opinion and Order in favor of the Respondent.

*Signed: Jennifer B. Coffman*

JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCY

---

[3] The report was created on April 14, 2008.